## Wood Appeal.

Argued March 6, 1950. Before Rhodes, P. J., Hirt, Reno, Dithrich, Ross and Arnold, JJ.

*Joseph P. Kane,* with him *Edward M. Murphy,* for appellant.

*Walter L. Hill, Jr.,* with him *O'Malley, Harris, Harris & Warren,* for appellee.

Opinion by Hirt, J., July 20, 1950:

This proceeding for the appointment of a guardian of the estate of Jennie Howell Dean, an alleged weak-minded person, was brought under the Act of May 28, 1907, P. L. 292, as amended, 50 PS §941, et seq. Edwina Howell Wood, her granddaughter, was the petitioner. She and her six-year-old daughter are Mrs. Dean's only

lineal descendants. The hearing judge concluded that the subject of this proceeding was able to take care of her property and was not liable to become the victim of designing persons within the intent of the Act, and accordingly dismissed the petition. On exceptions to the findings of the hearing judge the order was affirmed by the court en banc.

We are unable to agree with appellant's argument in limine that the order must be reversed because of the court's failure to observe the mandate of the statute as to procedure. It is argued that because §3 of the 1907 Act provides that "The court shall take the testimony" at the hearing, it was reversible error for a single judge of the court below to hear the parties and their witnesses. It undoubtedly is the general rule that whenever a statutory duty is imposed upon the court it can be discharged only by the assembled tribunal. *Carter's Estate,* 254 Pa. 518, 99 A. 58. But the principle has no application here. In accordance with the procedure generally observed, in which the appellant acquiesced without objection, the hearing was had before one judge to whom the matter had been assigned. To his adjudication dismissing the petition, 39 exceptions were filed. These were argued before the full court and were dismissed by final order of the court, after consideration of all of the testimony. Cf. *Kensington Club Liquor License,* 164 Pa. Superior Ct. 401, 65 A. 2d 428. There were no procedural errors of law. But, mindful as we are that the 1907 Act must be administered with the utmost caution (*Denner v. Beyer,* 352 Pa. 386, 42 A. 2d 747) yet, it is our settled conviction from a consideration of all of the testimony in this case that the lower court is chargeable with abuse of discretion in dismissing the petition. There is preponderating proof of her lack of mental capacity to manage her own business affairs.

Since we are reversing the order we will refer to the testimony in the light most favorable to the view of the

lower court. About fourteen years ago, on the death of her husband and of her only son in quick succession, Mrs. Dean suffered a critical mental illness. She then was returned to Scranton where she has been maintained in a house of her own. She is now more than 81 years old. Since coming to Scranton she has been under the care of Dr. E. L. Kiesel; his professional visits in the early years which were frequent, have become routine and he now sees her at intervals of about a month. Dr. Thomas G. Killeen, a Scranton physician, who examined Mrs. Dean at the instance of petitioner shortly before the hearing, gave it as his opinion that she was not physically nor mentally capable of conducting her business affairs. Against this conclusion, Dr. Kiesel, testified that in his opinion she is not feeble minded, but that for her age she is well able to manage her business affairs and is not likely to dissipate or lose her property nor become the victim of designing persons. He is supported in this opinion by Dr. Martin T. O'Malley, who had known Mrs. Dean for years and who examined her shortly before the hearing. Both of these physicians noted evidence of residual nervous disorder but it was their opinion that it did not involve her mental processes. Two of Mrs. Dean's contemporaries and life-long friends, Helen P. Cruttenden who is also her cousin, and Edith Porter, visit her frequently. Both gave it as their opinion that though she has been ill for many years and is in bad physical condition, her mental faculties are not impaired. But it was conceded by them that she long has had the habit of talking to herself; that in conversing she wanders from the subject and that she suffers delusions of believing that living persons, especially those near to her, are dead.

Mrs. Dean inherited a substantial sum from her father's estate and in 1923 joined with her husband, Edward B. Dean, in the purchase of an apartment house property in Washington, D. C., for $310,000. Subse-

quently she became the sole owner of the property. John W. Crow, a real estate officer of a Trust Company in Washington, who had been an executor of her husband's estate and who acted as her rental agent *prior to 1941* gave it as his opinion that she was then "competent to conduct business, if she had somebody by her side advising her". He said: "She well understood, after much explanation, what the matter before her was; and she always left me the impression that she knew exactly what she was doing". His testimony however related to the period 1936 to 1941 and not later.

In 1946 Mrs. Dean sold the Washington apartment property for $165,000. She received $103,000 in cash and a deed of trust, with the property as security, for the remaining consideration. The testimony is that her real estate agent in Washington, through straw grantees, in reality made the sale to himself and one year and three months later sold the property to the present owners for $203,000 at a large profit to himself. The apartment house, originally three separate buildings, was at least 40 years old in 1946, and it had not been a consistent income producer; over periods in 1939 and 1940 Mrs. Dean received as little as $5 monthly from the rents. This real estate had been twice sold for taxes, to be redeemed later when funds were available. Just prior to the sale by her, Mrs. Dean was receiving a return from the property of about $600 per month, but because of foreseeable increased maintenance costs, future net income appeared to be uncertain. She had employed a competent lawyer and it was his advice, confirmed by others who were qualified to express an opinion, that the sale of the property at the price of $165,000 was justified, considering the uncertainty of future returns and Mrs. Dean's need at her age for the security of an adequate dependable income. She had no other current resources, though there was the prospect of a return from a trust, established by her husband, which is still in litigation. The

fact that Mrs. Dean may have sold her Washington real estate for less than its market value is not proof in itself of mental incompetency under the circumstances and there can be no criticism of her choice of her legal advisor although if she was defrauded by her Washington real estate agent, as the record indicates, some effort well might have been exerted by someone on her behalf to recoup her loss. The rule (as stated in *Lafferty v. Moll,* 304 Pa. 501, 156 A. 112) is well settled that: "Where a real estate agent agrees to sell land for another, he cannot sell the land to a nominee or straw man acting for the agent who thereafter resells at a profit without accounting to the owner for such profits". Restatement, Agency, §389 and Comment; *Rich v. Black & Baird et al.,* 173 Pa. 92, 33 A. 880; *Powers v. Black et al.,* 159 Pa. 153, 28 A. 133.

Since her return to Scranton Mrs. Dean has been cared for by T. Glenn Sophia and his wife. They live with her. The wife acts as housekeeper. The husband in addition to maintaining the property and driving the automobile performs clerical duties and conducts some of Mrs. Dean's ordinary business transactions for her.

There had been a deep attachment between Mrs. Dean and her granddaughter ever since childhood. Following the death of her grandfather, Edward B. Dean, appellant went to live with Mrs. Dean in Washington and thereafter spent all vacation periods with her while in college. Mrs. Dean paid the entire cost of her education including her tuition and for years gave her a weekly money allowance in an amount fixed not by Mrs. Dean but by Mr. Sophia. Appellant was married in 1942 and in the following year she and her two-months-old daughter spent a weekend with Mrs. Dean. Since then she has been prevented from seeing or communicating with her grandmother by the Sophias. In 1945 when she brought her young daughter to call, Mr. Sophia said: "Your grand-

mother will not see you". And on another occasion, after assurance from Dr. Kiesel that Mrs. Dean was in condition to receive visitors, she and her young daughter were again denied admittance by the Sophias. Thereafter appellant made several attempts to talk with Mrs. Dean by telephone without success. In each instance Mr. Sophia who answered the calls stated that Mrs. Dean would not talk to her. She also wrote a number of letters to Mrs. Dean in an attempt to make an appointment with her but without success. The testimony that the Sophias prevented appellant from seeing her grandmother, undenied, is of significance for the reason that there never had been any breach in the relations between them and no reason was ever advanced for the alleged unwillingness of Mrs. Dean to talk with her granddaughter. The best evidence of Mrs. Dean's affection for appellant is her testimony taken at the hearing in this case. Referring undoubtedly to their last meeting she testified that she said to appellant: "This is always your home. Any time you want to come, you can do it". Mrs. Cruttenden also testified to the affection Mrs. Dean had for her granddaughter and said that she had been informed by Mrs. Dean that appellant was the principal beneficiary under a will which she had made. And referring to the fact that appellant no longer visited in the home of her grandmother, Mrs. Cruttenden said: "I had missed Edwina and though I didn't say much about it I knew there was some cause but I didn't inquire into it". The exclusion of appellant from the Dean home is of added significance in the light of the fact that Mrs. Dean believed appellant to be dead. In her testimony she said that she *had been told* of Edwina's death but she "wasn't able to go up to the funeral; . . . they said she had passed away, but I didn't go . . . They said she had the same trouble as her father, heart trouble". *The delusion of her granddaughter's death persisted even at the time of the hearing in spite of the fact that she elsewhere in her testimony*

*indicated that she knew appellant had brought this proceeding.* Mrs. Dean also had been told, according to her testimony, of the deaths of Mrs. Cruttenden and her son and grandson who with appellant normally would be the natural objects of her bounty. Because Mrs. Dean's father had been a spiritualist and the fact that she may have been brought up in the atmosphere of that cult does not adequately account for these delusions. We are not impressed with that argument. A reading of her testimony demonstrates weakness of mind and her delusions from suggestions of the deaths of those who are dearest to her indicate that she may be victimized by designing persons. Belief in their deaths would be good reason for her disposition of her property to others.

We are not indicting the Sophias but they are the only ones who could successfully prevent appellant from seeing her grandmother. They too, because of the existing confidential relationship, could be most convincing in fostering the delusion of appellant's death. Without question they could have dispelled the delusion at any time by admitting appellant to the Dean home to see her grandmother. There is other testimony which may be evidence of self interest on the part of Mr. Sophia. As early as 1941 he suggested to Mr. Crow who was then managing the apartment house in Washington for Mrs. Dean, that he and Crow buy the property for their joint profit. Moreover, Mrs. Dean is too dependent upon others to be considered capable of managing her affairs. The testimony is that Mrs. Dean does not know the combination of the safe in her house in which all of her valuables and securities are kept. Mr. Sophia alone has the combination. She is the life beneficiary and one of the trustees of a trust estate now valued at about $260,-000, which had been established by her husband. She testified that she does not know what the trust fund consists of. She sold her Washington property but doesn't know when it was sold nor for what price nor the name of her

Washington real estate agent. She is now dependent upon her lawyer for information as to the extent of her property and nature of her estate.

Moreover, to conclude, from the fact that Mrs. Dean has delegated the conduct of all her important business affairs to others, that she does not need a guardian of her estate, is to beg the basic question involved, because unless she has mental capacity to manage her affairs herself she lacks the ability to appoint agents to do it for her. The derived authority in her agents cannot mount higher than her capacity to delegate such authority to them. 2 Am. Jur. Agency, §67, note 14, and §14; Restatement, Agency, §20.

Even testamentary capacity may be questioned in one who does not apprehend the extent of his property and who is deluded in the mistaken belief of the death of one who, above all others, is the natural object of his bounty. And less capacity is needed to make a will than is necessary in most cases to transact ordinary business. *Sturgeon Will,* 357 Pa. 75, 53 A. 2d 139.

In our view this case presents much more than the mere opportunity for the exercise of undue influence upon Mrs. Dean in the disposition of her property and estate. Facts which are not contraverted indicate weakness of mind and her inability to care for her property for that reason. As against these facts, established in this record, opinion evidence of appellee's experts is of no avail. Opinion evidence is not entitled to much weight against positive testimony of actual facts. *Ray to use v. Philadelphia,* 344 Pa. 439, 441, 25 A. 2d 145; *McCormick Transp. Co. v. Philadelphia Transp. Co.,* 161 Pa. Superior Ct. 533, 55 A. 2d 771. This principle is no less applicable when opinion evidence, at variance with factual proofs, relates to mental condition rather than to physical disability. Cf. *Reardon v. Travelers Insurance Co.,* 166 Pa. Superior Ct. 365 at 368, 71 A. 2d 829.

. Judgment reversed with direction to reinstate the petition and to appoint a guardian of the estate of Jennie Howell Dean as prayed for.